## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF INDIANA
## INDIANAPOLIS DIVISION

| | |
|---|---|
| PAUL PARSHALL, Individually and On Behalf of All Others Similarly Situated, | ) ) ) |
| Plaintiff, | ) ) Case No. 1:17-cv-00711 ) |
| v. | ) CLASS ACTION COMPLAINT FOR ) VIOLATIONS OF SECTIONS 14(a) ) AND 20(a) OF THE SECURITIES |
| STONEGATE MORTGAGE CORPORATION, RICHARD A. KRAEMER, KEVIN BHATT, JAMES BROWN, SAM LEVINSON, RICHARD A. MIRRO, SCOTT MUMPHREY, HOME POINT FINANCIAL CORPORATION,  and LONGHORN MERGER SUB, INC., | ) EXCHANGE ACT OF 1934 ) ) JURY TRIAL DEMANDED ) ) ) ) ) ) ) |
| Defendants. | ) ) |

## CLASS ACTION COMPLAINT

Plaintiff Paul Parshall ("Plaintiff"), by his undersigned attorneys, for this Class Action Complaint against defendants, alleges upon personal knowledge with respect to himself, and upon information and belief based upon, *inter alia*, the investigation of counsel as to all other allegations herein, as follows:

## NATURE OF THE ACTION

1.     This action stems from a proposed transaction announced on January 27, 2017 (the "Proposed Transaction"), pursuant to which Stonegate Mortgage Corporation ("Stonegate" or the "Company") will be acquired by Home Point Financial Corporation ("Parent") and Longhorn Merger Sub, Inc. ("Merger Sub" and together with Parent, "Home Point").

2.      On January 26, 2017, Stonegate's Board of Directors (the "Board" or "Individual Defendants") caused the Company to enter into an agreement and plan of merger (the "Merger Agreement") with Home Point.  Pursuant to the terms of the Merger Agreement, shareholders of Stonegate will receive $8.00 in cash for each share of Stonegate common stock.

3.      On February 28, 2017, defendants filed a proxy statement (the "Proxy Statement") with the United States Securities and Exchange Commission ("SEC") in connection with the Proposed Transaction.

4.      The Proxy Statement omits material information with respect to the Proposed Transaction, which renders the Proxy Statement false and misleading. Accordingly, Plaintiff alleges herein that defendants violated Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "1934 Act") in connection with the Proxy Statement.

<u>JURISDICTION AND VENUE</u>

5.      This Court has jurisdiction over the claims asserted herein pursuant to Section 27 of the 1934 Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331 (federal question jurisdiction) because the claims asserted herein arise under Sections 14(a) of the 1934 Act and Rule 14a-9 promulgated thereunder and 20(a) of the 1934 Act.

6.      This Court has personal jurisdiction over defendants because each defendant is either a corporation that conducts business in and maintains operations within this District, or is an individual with sufficient minimum contacts with this

District so as to make the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

7.     Venue is proper under Section 27 of the 1934 Act (15 U.S.C. § 78aa), as well as 28 U.S.C. § 1391(b) because (i) the conduct at issue took place and had an effect in this District; (ii) a substantial portion of the transactions and wrongs complained of herein occurred in this District; and (iii) defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## <u>PARTIES</u>

8.     Plaintiff is, and has been continuously throughout all times relevant hereto, the owner of Stonegate common stock. Plaintiff is a citizen of Florida.

9.     Defendant Stonegate is an Ohio corporation and maintains its principal executive offices at 9190 Priority Way West Drive, Suite 300, Indianapolis, Indiana 46240.  Stonegate's common stock is traded on the NYSE under the ticker symbol "SGM."

10.    Defendant Richard A. Kraemer ("Kraemer") has served as a director of Stonegate since May 2013 and is Chairman of the Board.

11.    Defendant Kevin Bhatt ("Bhatt") has served as a director of Stonegate since February 2012.

12.    Defendant James Brown ("Brown") has served as a director of Stonegate since February 2012.

13.     Defendant Sam Levinson ("Levinson") has served as a director of Stonegate since May 2013.  According to the Company's website, Levinson is Chair of the Compensation Committee, a member of the Audit Committee, and a member of the Nominating and Governance Committee.

14.     Defendant Richard A. Mirro ("Mirro") has served as a director of Stonegate since February 2012.  According to the Company's website, Mirro is Chair of the Audit Committee, a member of the Nominating and Governance Committee, and a member of the Compensation Committee.

15.     Defendant Scott Mumphrey ("Mumphrey") has served as a director of Stonegate since February 2010.  According to the Company's website, Mumphrey is Chair of the Nominating and Governance Committee, a member of the Audit Committee, and a member of the Compensation Committee.

16.     The defendants identified in paragraphs 10 through 15 are collectively referred to herein as the "Individual Defendants."

17.     Defendant Parent is a New Jersey corporation with its principal executive offices located at 1194 Oak Valley Drive, Suite 80, Ann Arbor, Michigan 48108.

18.     Defendant Merger Sub is an Ohio corporation, a wholly-owned subsidiary of Parent, and a party to the Merger Agreement.

## CLASS ACTION ALLEGATIONS

19.     Plaintiff brings this action as a class action on behalf of himself and the other public stockholders of Stonegate (the "Class").  Excluded from the Class are

defendants herein and any person, firm, trust, corporation, or other entity related to or affiliated with any defendant.

20. This action is properly maintainable as a class action.

21. The Class is so numerous that joinder of all members is impracticable. As of January 26, 2017, there were approximately 25,854,022 shares of Stonegate common stock outstanding, held by hundreds, if not thousands, of individuals and entities scattered throughout the country.

22. Questions of law and fact are common to the Class, including, among others, whether defendants will irreparably harm Plaintiff and the other members of the Class if defendants' conduct complained of herein continues.

23. Plaintiff is committed to prosecuting this action and has retained competent counsel experienced in litigation of this nature. Plaintiff's claims are typical of the claims of the other members of the Class and Plaintiff has the same interests as the other members of the Class. Accordingly, Plaintiff is an adequate representative of the Class and will fairly and adequately protect the interests of the Class.

24. The prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications that would establish incompatible standards of conduct for defendants, or adjudications that would, as a practical matter, be dispositive of the interests of individual members of the Class who are not parties to the adjudications or would substantially impair or impede those non-party Class members' ability to protect their interests.

5

25.     Defendants have acted, or refused to act, on grounds generally applicable to the Class as a whole, and are causing injury to the entire Class. Therefore, final injunctive relief on behalf of the Class is appropriate.

## SUBSTANTIVE ALLEGATIONS

*Background of the Company and the Proposed Transaction*

26.     Founded in 2005, Stonegate is a specialty finance company that operates as an intermediary between residential mortgage borrowers and the ultimate investors of these mortgages.

27.     The Company focuses on providing yield opportunities in the residential mortgage market to investors through originating, financing, and servicing U.S. residential mortgage loans.

28.     Stonegate's integrated and scalable residential mortgage banking platform includes a diversified origination business that includes a retail branch network, a direct to consumer call center, and a network of third party originators consisting of mortgage brokers, mortgage bankers, and financial institutions (banks and credit unions).

29.     The Company performs servicing for its own mortgage servicing rights as well as those owned by other investors.

30.     Stonegate also provides warehouse financing through its NattyMac, LLC subsidiary to third party correspondent lenders.

31.     On August 4, 2016, Stonegate issued a press release wherein it reported its second quarter 2016 financial results.  Revenues during the second quarter of 2016

were $26.5 million, up $21.5 million, or 432%, compared to the first quarter of 2016.

Adjusted net income for the second quarter 2016 was $1.0 million, or $0.04 per diluted

share, compared to a reported adjusted net loss of $3.1 million, or $0.12 per diluted

share, for the first quarter of 2016.

32.    With respect to the results, Individual Defendant Smith, CEO of the

Company, commented:

> During the second quarter, we saw continued volatility within the
> financial markets primarily driven by economic concerns abroad. While
> this environment presented some challenges related to GAAP earnings,
> we were pleased with the overall performance of our business segments
> and the profitability of our core operations[.] The success of our
> restructuring efforts and execution of our cost management strategies
> have positioned us well for future earnings stability. As a result, we
> generated $1.0 million dollars in adjusted net income for the quarter.
> Production was up 21% and we posted a significant increase in total
> revenues while our overall expenses decreased by 2%. We continue to be
> highly focused on driving core earnings, strengthening our balance sheet
> and delivering value to our shareholders.

33.    On November 3, 2016, Stonegate issued a press release wherein it

reported its strong third quarter 2016 financial results.

34.    Total revenues during the third quarter of 2016 were $66.3 million, up

$39.8 million, or 150%, compared to the second quarter of 2016.  Compared to the

third quarter of 2015, revenues were up $40.7 million, or 159%.

35.    Net income from continuing operations improved $32.7 million, or $1.26

per diluted share, in the third quarter of 2016 to $15.6 million, or $0.60 per diluted

share, compared to a net loss from continuing operations of $17.2 million, or $0.66

per diluted share, in the second quarter of 2016.  Net income from continuing

operations was up $35.8 million, or $1.38 per diluted share, compared to the third

quarter of 2015, during which the Company reported a net loss from continuing operations of $20.2 million, or $0.78 per diluted share.

36.    Adjusted net income from continuing operations for the third quarter of 2016 was $11.0 million, or $0.42 per diluted share, compared to reported adjusted net income from continuing operations of $1.0 million, or $0.04 per diluted share, for the second quarter of 2016. Adjusted net income from continuing operations was up $8.2 million, or $0.31 per diluted share, compared to the third quarter of 2015, during which the Company reported adjusted net income from continuing operations of $2.8 million, or $0.11 per diluted share.

37.    With respect to the financial results, Individual Defendant Smith commented:

> We are extremely pleased to report strong GAAP and adjusted net income for the third quarter[.] Our business platform was well prepared to benefit from increased production levels during the quarter and, as a result, we achieved GAAP earnings of $15.6 million and adjusted net income of $11.0 million. We continue to be highly focused on maintaining prudent liquidity and MSR debt levels, as well as fully leveraging our cost structure. Thanks to the dedication and commitment of our associates and the support of our many customers, Stonegate continues to deliver value to our shareholders.

38.    Nevertheless, on January 26, 2017, the Board caused the Company to enter into the Merger Agreement, pursuant to which Stonegate will be acquired for inadequate consideration.

39.    The Individual Defendants have all but ensured that another entity will not emerge with a competing proposal by agreeing to a "no solicitation" provision in the Merger Agreement that prohibits the Individual Defendants from soliciting

alternative proposals and severely constrains their ability to communicate and

negotiate with potential buyers who wish to submit or have submitted unsolicited

alternative proposals.  Section 6.9(a) of the Merger Agreement states, in relevant

part:

> (a) The Company agrees that it will not, and will cause its Subsidiaries
> and its and their officers, directors, employees and controlled affiliates
> and its and their agents, advisors, consultants, and other
> representatives (collectively, "Representatives") not to, directly or
> indirectly, (i) initiate, solicit, knowingly encourage or knowingly
> facilitate inquiries, offers or proposals, or the making, submission or
> announcement of inquiries, offers or proposals, which constitute, or
> could reasonably be expected to lead to, an Acquisition Proposal, (ii)
> engage or participate or continue any discussions or any negotiations
> with any person concerning any Acquisition Proposal, (iii) provide any
> confidential or nonpublic information or data to, or have or participate
> in any discussions with, any person relating to any Acquisition Proposal
> or any inquiry, offer or proposal that could reasonably be expected to
> lead to an Acquisition Proposal, except to notify a person that makes an
> inquiry with respect to an Acquisition Proposal, of the existence of the
> provisions of this Section 6.9(a), (iv) approve, endorse, recommend or
> execute or enter into any letter of intent, agreement or agreement in
> principle relating to any Acquisition Proposal or any inquiry, offer or
> proposal that could reasonably be expected to lead to an Acquisition
> Proposal, (v) otherwise knowingly facilitate any effort or attempt to
> make an Acquisition Proposal, including by granting any waiver,
> amendment or release under any standstill agreement or any standstill
> provision of any other contract or agreement (except that the Board of
> Directors of the Company, or any committee thereof, may grant any such
> waiver, amendment or release if it has determined in good faith, after
> consultation with its outside legal counsel, that failure to take such
> action would be inconsistent with the directors' fiduciary duties under
> applicable Law) or any Takeover Statutes or (vi) resolve, publicly
> propose or agree to do any of the foregoing[.] . . . The Company will, and
> will cause its Representatives to, immediately cease and cause to be
> terminated any activities, discussions or negotiations conducted before
> the date of this Agreement with any person other than Parent and its
> affiliates and Representatives with respect to any Acquisition Proposal,
> including by terminating all physical and electronic data room access
> previously granted to any such person or its Representatives, and the
> Company shall promptly request the prompt return or destruction of all

confidential information previously furnished to any such other person (subject to the terms of any confidentiality agreement with each such person).

40.    Further, the Company must promptly advise Home Point of any proposals or inquiries received from other parties.   Section 6.9(a) of the Merger Agreement states, in relevant part:

> The Company will promptly (and in any event within forty-eight (48) hours of the Company's knowledge of such event) advise Parent in writing of the receipt of any Acquisition Proposal or any inquiry which could reasonably be expected to lead to an Acquisition Proposal, and the substance thereof (including, subject to the terms of any confidentiality agreement entered into by the Company prior to the date hereof, the material terms and conditions of and the identity of the person making such inquiry or Acquisition Proposal, and copies of all written requests, proposals, offers or proposed agreements received by the Company), and will keep Parent reasonably and promptly (and in any event within forty-eight (48) hours) informed of any related developments, discussions and negotiations on a current basis, including any amendments to or revisions of the material terms of such inquiry or Acquisition Proposal.

41.    Moreover, the Merger Agreement contains a highly restrictive "fiduciary out" provision permitting the Board to withdraw its approval of the Proposed Transaction under extremely limited circumstances, and grants Home Point a "matching right" with respect to any "Superior Proposal" made to the Company. Section 6.9(c) of the Merger Agreement provides:

> (c) Notwithstanding anything in this Agreement to the contrary, at any time after the date of this Agreement and prior to the time the Requisite Company Vote is obtained, the Board of Directors of the Company may (i) either cause the Company to terminate this Agreement in accordance with Section 8.1(e) or effect a Company Adverse Recommendation Change involving the actions described in Section 6.9(b)(i) if (A) the Company receives an unsolicited, bona fide, written Acquisition Proposal that did not result from a material breach of this Section 6.9 (and such proposal is not withdrawn) and (B) the Board of Directors of

the Company determines in good faith (after receiving the advice of its outside legal counsel and, with respect to financial matters, its financial advisor) that such Acquisition Proposal constitutes a Superior Proposal (either such action, a "Superior Proposal Event"), or (ii) effect a Company Adverse Recommendation Change involving the actions described in Section 6.9(b)(i) in response to an Intervening Event (as defined below) (such action, an "Intervening Event Adverse Recommendation Change"), in each case of clauses (i) and (ii) if the Board of Directors of the Company concludes in good faith (after receiving the advice of its outside legal counsel and, with respect to financial matters, its financial advisor) that the failure to take such action would be inconsistent with the directors' fiduciary duties under applicable Law; provided, however, that the Board of Directors of the Company may not take any actions under this sentence unless (A) it gives Parent at least three (3) business days' prior written notice of its intention to take such action (which notice, if concerning an intended Intervening Event Adverse Recommendation Change, shall include a description of the Intervening Event in reasonable detail or, if concerning a Superior Proposal Event, shall specify the latest material terms and conditions of, and the identity of the third party making, any such Superior Proposal or any amendment or modification thereof, and include an unredacted copy of any proposal letter and the latest draft agreements relating to such Superior Proposal (including exhibits and schedules, if any)), (B) after providing such notice and prior to taking such action, the Company shall, and shall cause its Representatives to, negotiate with Parent in good faith (to the extent Parent indicates in writing a desire to negotiate) to make such adjustments in the terms and conditions of this Agreement as would permit the Company not to effect a Superior Proposal Event or an Intervening Event Adverse Recommendation Change, and (C) at the end of such notice period, the Board of Directors of the Company shall have considered in good faith any amendment or modification to this Agreement proposed in writing by Parent and (x) with respect to an intended Intervening Event Adverse Recommendation Change, shall have determined in good faith that failure to effect an Intervening Event Adverse Recommendation Change would be inconsistent with the directors' fiduciary duties under applicable Law and (y) with respect to an intended Superior Proposal Event, shall have determined that the Superior Proposal would continue to constitute a Superior Proposal if such changes were to be given effect and that failure to effect the Superior Proposal Event would be inconsistent with the directors' fiduciary duties under applicable Law. Any material amendment to any Acquisition Proposal will be deemed to be a new Acquisition Proposal for purposes of this Section 6.9 and will require a new notice period as referred to in this Section 6.9. As used in

this Agreement, "Superior Proposal" means a bona fide, unsolicited, written Acquisition Proposal (with all references to "20%" being deemed to be replaced by references to "50%") for which the Board of Directors of the Company has determined in good faith, after consultation with outside legal counsel and, with respect to financial matters, its financial advisor, (x) is more likely than not to be consummated in accordance with its terms, taking into account all relevant legal, financial, regulatory and other aspects of such Acquisition Proposal and such other factors that are deemed relevant by the Board of Directors of the Company, and (y) if consummated, would be more favorable to the Stockholders from a financial point of view than the transactions contemplated by this Agreement (after taking into account any proposed revisions to the terms of this Agreement pursuant to this Section 6.9). As used in this Agreement, "Intervening Event" means an Effect (other than any Effect resulting from a material breach of this Agreement by the Company) that was not known to the Board of Directors of the Company as of the date hereof and becomes known to the Board of Directors of the Company after the date hereof and prior to the time the Requisite Company Vote is obtained; provided, that the receipt, existence or terms of an Acquisition Proposal, or any matter relating thereto or consequence thereof, shall not constitute an Intervening Event.

42. Further locking up control of the Company in favor of Home Point, the Merger Agreement provides for a "termination fee" of $7,250,000, payable by the Company to Home Point if the Individual Defendants cause the Company to terminate the Merger Agreement.

43. By agreeing to all of the deal protection devices, the Individual Defendants have locked up the Proposed Transaction and have precluded other bidders from making successful competing offers for the Company.

44. Additionally, certain stockholders, directors, and executive officers of the Company have entered into voting agreements pursuant to which they have agreed to vote their shares in favor of the Proposed Transaction. Accordingly,

approximately 36% of the Company's shares are already locked up in favor of the Proposed Transaction.

45.     Moreover, in connection with the Proposed Transaction, the Individual Defendants adopted a "Tax Asset Protection Plan," which "is designed to reduce the likelihood that Stonegate Mortgage will experience an ownership change prior to the closing of the Proposed Merger by discouraging any person from acquiring beneficial ownership of 4.9 percent or more of Stonegate Mortgage's outstanding common stock."

46.     The consideration to be provided to Plaintiff and the Class in the Proposed Transaction is inadequate.

47.     Among other things, the intrinsic value of the Company is materially in excess of the amount offered in the Proposed Transaction.

48.     The merger consideration also fails to adequately compensate the Company's stockholders for the significant synergies that will result from the Proposed Transaction.

49.     Accordingly, the Proposed Transaction will deny Class members their right to share proportionately and equitably in the true value of the Company's valuable and profitable business, and future growth in profits and earnings.

*The Proxy Statement Omits Material Information, Rendering It False and Misleading*

50.     Defendants filed the Proxy Statement with the SEC in connection with the Proposed Transaction.

51.     The Proxy Statement omits material information with respect to the Proposed Transaction, which renders the Proxy Statement false and misleading.

52.     First, the Proxy Statement omits material information regarding Stonegate's financial projections and the financial analyses performed by the Company's financial advisor, Barclays Capital, Inc. ("Barclays"), in support of its so-called fairness opinion.

53.     With respect to Stonegate's financial projections, the Proxy Statement fails to disclose:  (i) a reconciliation of all non-GAAP to GAAP metrics; (ii) stock-based compensation expense; (iii) net operating loss carryforwards; (iv) dividends; (v) projected book value of equity; (vi) adjusted net operating earnings; (vii) the "sum-of-the-parts" projections for the Company's business segments; and (viii) projected cash flows.

54.     With respect to Barclays' *Dividend Discount Analysis*, the Proxy Statement fails to disclose:  (i) Barclays' basis for assuming that no dividends would be paid by the Company in any year; (ii) the estimated price per share of Company common stock in 2020; (iii) Barclays' basis for selecting a range of exit multiples of book value of 0.8x to 1.0x; and (iv) the inputs and assumptions used to determine the discount rate range of 12.0% to 19.5%.

55.     With respect to Barclays' *Selected Comparable Public Company Analysis*, the Proxy Statement fails to disclose the individual multiples and financial metrics for the companies observed by Barclays in its analysis.

14

56.     With respect to Barclays' *Illustrative Sum of the Parts Analysis*, the Proxy Statement fails to disclose:  (i) the financial forecasts, including those for the Company's origination, financing, corporate business, and servicing business segments, relied upon by Barclays in its analysis; (ii) the book value of the servicing business segment provided to Barclays by Company management; (iii) Barclays' basis for assuming a reference multiple range of 5.0x to 6.5x and a reference multiple range of 75% to 85%; and (iv) the resulting implied prices per share of Company common stock.

57.     With respect to Barclays' *Selected Precedent Transactions Analysis*, the Proxy Statement fails to disclose:  (i) the transactions selected by Barclays in its analysis; (ii) the individual multiples and financial metrics for the transactions observed by Barclays in its analysis; and (iii) the resulting implied prices per share of Company common stock.

58.     With respect to Barclays' *Historical Premiums Paid Analysis*, the Proxy Statement fails to disclose the premiums paid in the cash transactions analyzed by Barclays.

59.     With respect to Barclays' *Analyst Perspectives Analysis*, the Proxy Statement fails to disclose the per share price targets for Company common stock.

60.     When a banker's endorsement of the fairness of a transaction is touted to shareholders, the valuation methods used to arrive at that opinion as well as the key inputs and range of ultimate values generated by those analyses must also be fairly disclosed.   Moreover, the disclosure of projected financial information is

material because it provides stockholders with a basis to project the future financial performance of a company, and allows stockholders to better understand the financial analyses performed by the company's financial advisor in support of its fairness opinion.

61.     The omission of this material information renders the Proxy Statement false and misleading, including, *inter alia*, the following sections of the Proxy Statement:  (i) "Background of the Merger"; (ii) "Recommendation of the Company Board of Directors; Reasons for the Merger"; (iii) "Unaudited Prospective Financial Information"; and (iv) "Opinion of Barclays Capital Inc."

62.     Second, the Proxy Statement omits material information regarding FBR Capital Markets & Co. ("FBR"), Stonegate's second financial advisor in connection with the Proposed Transaction.

63.     Specifically, the Proxy Statement fails to disclose any information regarding FBR's engagement, including the fee to be received by FBR, the percentage of the fee that is contingent upon consummation of the Proposed Transaction, and the services FBR has provided to Stonegate, Home Point, and/or their affiliates in the past two years and the amount of compensation received for such services.

64.     Full disclosure of investment banker compensation and all potential conflicts is required due to the central role played by investment banks in the evaluation, exploration, selection, and implementation of strategic alternatives.

65.     The omission of this material information renders the Proxy Statement false and misleading, including, *inter alia*, the following sections of the Proxy

Statement:   (i) "Background of the Merger"; and (ii) "Recommendation of the Company Board of Directors; Reasons for the Merger."

66.   Third, the Proxy Statement fails to disclose whether any non-disclosure agreement executed by Stonegate contained standstill and/or "don't ask, don't waive" provisions that prevented (or are preventing) parties from submitting topping bids to acquire the Company, or from requesting a waiver a standstill provision.

67.   Without this information, stockholders may have the mistaken belief that, if these potentially interested parties wished to come forward with a superior offer, they are permitted to do so, when in fact they are or were contractually prohibited from doing so.

68.   The omission of this material information renders the Proxy Statement false and misleading, including, *inter alia*, the following sections of the Proxy Statement:   (i) "Background of the Merger"; and (ii) "Recommendation of the Company Board of Directors; Reasons for the Merger."

69.   Fourth, the Proxy Statement omits material information regarding potential conflicts of interest of the Company's officers and directors.

70.   Specifically, the Proxy Statement fails to disclose the timing and nature of all communications regarding future employment and/or directorship of Stonegate's officers and directors, including who participated in all such communications.

71.   Communications regarding post-transaction employment during the negotiation of the underlying transaction must be disclosed to stockholders.  This

information is necessary for stockholders to understand potential conflicts of interest of management and the Board, as that information provides illumination concerning motivations that would prevent fiduciaries from acting solely in the best interests of the Company's stockholders.

72.    The omission of this material information renders the Proxy Statement false and misleading, including, *inter alia*, the following sections of the Proxy Statement:  (i) "Background of the Merger"; (ii) "Recommendation of the Company Board of Directors; Reasons for the Merger"; and (iii) "Interests of Certain Persons in the Merger."

73.    The above-referenced omitted information, if disclosed, would significantly alter the total mix of information available to Stonegate's stockholders.

## COUNT I

**(On Behalf of Plaintiff and the Class Against Stonegate and the Individual Defendants for Violations of Section 14(a) of the 1934 Act and Rule 14a-9 Promulgated Thereunder)**

74.    Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

75.    The Individual Defendants disseminated the false and misleading Proxy Statement, which contained statements that, in violation of Section 14(a) of the 1934 Act and Rule 14a-9, in light of the circumstances under which they were made, omitted to state material facts necessary to make the statements therein not materially false or misleading.  Stonegate is liable as the issuer of these statements.

76.    The Proxy Statement was prepared, reviewed, and/or disseminated by the Individual Defendants.  By virtue of their positions within the Company, the

Individual Defendants were aware of this information and their duty to disclose this information in the Proxy Statement.

77.     The Individual Defendants were at least negligent in filing the Proxy Statement with these materially false and misleading statements.

78.     The omissions and false and misleading statements in the Proxy Statement are material in that a reasonable stockholder will consider them important in deciding how to vote on the Proposed Transaction.  In addition, a reasonable investor will view a full and accurate disclosure as significantly altering the total mix of information made available in the Proxy Statement and in other information reasonably available to stockholders.

79.     The Proxy Statement is an essential link in causing Plaintiff and the Company's stockholders to approve the Proposed Transaction.

80.     By reason of the foregoing, defendants violated Section 14(a) of the 1934 Act and Rule 14a-9 promulgated thereunder.

81.     Because of the false and misleading statements in the Proxy Statement, Plaintiff and the Class are threatened with irreparable harm.

<u>COUNT II</u>

**(On Behalf of Plaintiff and the Class Against the Individual Defendants and Home Point for Violations of Section 20(a) of the 1934 Act)**

82.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

83.     The Individual Defendants and Home Point acted as controlling persons of Stonegate within the meaning of Section 20(a) of the 1934 Act as alleged herein.

By virtue of their positions as officers and/or directors of Stonegate and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false statements contained in the Proxy Statement, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that Plaintiff contends are false and misleading.

84.     Each of the Individual Defendants and Home Point was provided with or had unlimited access to copies of the Proxy Statement alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause them to be corrected.

85.     In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control and influence the particular transactions giving rise to the violations as alleged herein, and exercised the same. The Proxy Statement contains the unanimous recommendation of the Individual Defendants to approve the Proposed Transaction.  They were thus directly in the making of the Proxy Statement.

86.     Home Point also had direct supervisory control over the composition of the Proxy Statement and the information disclosed therein, as well as the information that was omitted and/or misrepresented in the Proxy Statement.

87.     By virtue of the foregoing, the Individual Defendants and Home Point violated Section 20(a) of the 1934 Act.

88.     As set forth above, the Individual Defendants and Home Point had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) of the 1934 Act and Rule 14a-9, by their acts and omissions as alleged herein.  By virtue of their positions as controlling persons, these defendants are liable pursuant to Section 20(a) of the 1934 Act.  As a direct and proximate result of defendants' conduct, Plaintiff and the Class are threatened with irreparable harm.

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for judgment and relief as follows:

A.     Ordering that this action may be maintained as a class action and certifying Plaintiff as the Class representative and Plaintiff's counsel as Class counsel;

B.     Preliminarily and permanently enjoining defendants and all persons acting in concert with them from proceeding with, consummating, or closing the Proposed Transaction;

C.     In the event defendants consummate the Proposed Transaction, rescinding it and setting it aside or awarding rescissory damages;

D.     Directing the Individual Defendants to disseminate a Proxy Statement that does not contain any untrue statements of material fact and that states all material facts required in it or necessary to make the statements contained therein not misleading;

E.     Declaring that defendants violated Section 14(a) of the 1934 Act, as well as Rule 14a-9 promulgated thereunder, and/or Section 20(a) of the 1934 Act;

F.     Awarding Plaintiff the costs of this action, including reasonable allowance for Plaintiff's attorneys' and experts' fees; and

G.     Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff respectfully requests a trial by jury on all issues so triable.

Dated:  March 8, 2017                    Respectfully submitted,

RILEY WILLIAMS & PIATT, LLC


/s/ *James A. Piatt*
William N. Riley (#14941-49)
James A. Piatt (#28320-49)
301 Massachusetts Avenue
Indianapolis, IN 46204
(317) 633-5270
Fax:  (317) 426-3348
wriley@rwp-law.com
jpiatt@rwp-law.com

*Attorneys for Plaintiff*

**RIGRODSKY & LONG, P.A.**
Brian D. Long (to be admitted *pro hac vice*)
Gina M. Serra (to be admitted *pro hac vice*)
2 Righter Parkway, Suite 120
Wilmington, DE 19803
(302) 295-5310